IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

WANDA YOUNG, o/b/o            )
Tonya V. Brice, Deceased,     )
                              )
            Plaintiff,        )
                              )
      v.                      )   Case No. 06-0322-CV-W-REL-SSA
                              )
MICHAEL ASTRUE, Commissioner  )
of Social Security,           )
                              )
            Defendant.        )

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Wanda Young seeks review of the final decision of
the Commissioner of Social Security denying plaintiff's
application for disability benefits under Title II of the Social
Security Act ("the Act"). Plaintiff argues that the ALJ's
determination that plaintiff's disability began on May 30, 2002,
rather than December 19, 2001, is not supported by substantial
evidence. I find that the ALJ erred in finding plaintiff's
allegations not credible and in finding that plaintiff could
perform her past relevant work prior to May 30, 2002. Therefore,
plaintiff's motion for summary judgment will be granted and the
decision of the Commissioner will be reversed.

*I.  BACKGROUND*

On August 15, 2002, Tonya Brice applied for disability
benefits alleging that she had been disabled since January 11,
2002. Her disability stemmed from fibromyalgia, depression, and
migraines. By letter dated October 1, 2002, from Ms. Brice's

attorney, she asked that her alleged onset date be amended to December 19, 2001. Ms. Brice's application for disability benefits was approved; however, the onset date was determined to be January 2, 2002. Ms. Brice requested a hearing. A hearing was held on August 18, 2004. On December 22, 2004, the ALJ found Ms. Brice was not disabled from December 18, 2001, through May 29, 2002, but was disabled as of May 30, 2002. Upon the death of Ms. Brice, her mother, Wanda Young, requested she be substituted as plaintiff. On February 17, 2006, the Appeals Council denied the request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

On July 31, 2006, plaintiff filed her brief arguing that the ALJ erred ignoring evidence that plaintiff had not worked since her amended alleged onset date of December 19, 2001. On September 11, 2006, defendant filed a response, pointing out that the ALJ did not make an adverse finding at step one, but rather found that there was insufficient evidence to find that plaintiff had engaged in substantial gainful activity since her amended alleged onset date. Defendant points out that the ALJ continued with the sequential analysis and found that plaintiff was not disabled from December 19, 2001, until May 30, 2002, because she could return to her past relevant work during that time, and that she became disabled on May 30, 2002, due to residuals from a fractured ankle. On September 28, 2006, plaintiff filed a reply

arguing that the ALJ's finding that plaintiff was not credible is based in part on the ALJ's statement that plaintiff did not fully explain $20,153.45 in earnings during 2002.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." <u>Richardson v. Perales</u>, 402
U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th
Cir. 1991).  However, the substantial evidence standard
presupposes a zone of choice within which the decision makers can
go either way, without interference by the courts.  "[A]n
administrative decision is not subject to reversal merely because
substantial evidence would have supported an opposite decision."
<u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of
proving she is unable to return to past relevant work by reason
of a medically-determinable physical or mental impairment which
has lasted or can be expected to last for a continuous period of
not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the
plaintiff establishes that she is unable to return to past
relevant work because of the disability, the burden of persuasion
shifts to the Commissioner to establish that there is some other
type of substantial gainful activity in the national economy that
the plaintiff can perform.  <u>Nevland v. Apfel</u>, 204 F.3d 853, 857
(8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo.
2000).

The Social Security Administration has promulgated detailed
regulations setting out a sequential evaluation process to

determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u>  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes =  go to next step where burden shifts to Commissioner.

5.   Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

## IV.  THE RECORD

The record consists of the testimony of plaintiff and vocational expert Janice Hastert, in addition to documentary evidence admitted at the hearing.

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1983 through 2002:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1983 | $ 2,584.39 | 1993 | $32,012.72 |
| 1984 | 4,569.02 | 1994 | 37,609.62 |
| 1985 | 5,051.14 | 1995 | 40,624.82 |
| 1986 | 10,195.74 | 1996 | 35,573.19 |
| 1987 | 23,526.07 | 1997 | 34,655.92 |
| 1988 | 23,122.04 | 1998 | 41,707.73 |
| 1989 | 16,387.80 | 1999 | 38,646.15 |
| 1990 | 23,702.94 | 2000 | 38,535.64 |
| 1991 | 24,000.28 | 2001 | 39,813.68 |
| 1992 | 28,868.36 | 2002 | 20,153.45 |

(Tr. at 83, 87, 88).

**Claimant Questionnaire**

In a Claimant Questionnaire completed on September 13, 2002, plaintiff reported that her pain is so severe that she sometimes feels the only way out is to not be here "and I think of killing myself often." (Tr. at 124). Plaintiff reported that she has had muscle spasms so severe that she had to go to the emergency room and have several morphine shots (Tr. at 124). Plaintiff described the side effects of her medication to include skin

6

rash, fatigue, blurred vision, dry mouth, unpleasant taste,
constipation, nausea and vomiting, weight gain, increased
appetite, headaches, weakness, irregular heartbeat, fainting,
heartburn, shakiness, decreased coordination, mental/mood
changes, and memory loss (Tr. at 124).

Plaintiff reported that she sits on a shower stool because
she cannot stand long enough to take a shower (Tr. at 125).
Plaintiff's mother cooks for her, or she eats cereal, grilled
cheese, tuna, and other things that do not require much
preparation (Tr. at 125). Plaintiff stated that she cannot hold
a phone for very long due to arm fatigue and pain, and she cannot
hold the phone with her shoulder due to neck pain (Tr. at 127).

**Claimant Questionnaire Supplement**

In a Claimant Questionnaire Supplement completed on
September 13, 2002, plaintiff reported that she can sit in a good
chair for a couple of hours but must frequently shift position,
she can stand less than one hour total, she can walk less than
one hour total, can lift ten to 15 pounds occasionally, she can
reach overhead only briefly and sometimes has trouble finishing
washing her hair (Tr. at 128).

**B.   *SUMMARY OF MEDICAL RECORDS***

On September 21, 2001, plaintiff saw Mark Box, M.D. (Tr. at
220). She said she was not able to afford the increased dose of
Neurontin (for pain) at 800 mg three times a day, which was

7

significantly more expensive than the 600 mg dose. She was able to control most of her symptoms of fibromyalgia on Neurontin, Mobic (non-steroidal anti-inflammatory), and Celexa (for depression), but she still "has a lot of ups and downs. She still has a lot of pain that makes it difficult for her to function, especially in her back, arms and legs." Plaintiff had classic fibromyalgia tender points that were moderate. Dr. Box recommended Vicodin (narcotic) for pain.

On October 1, 2001, plaintiff saw Sean Fulton, M.D., at St. Joseph Health Center for complaints of vomiting (Tr. at 303-304). Plaintiff was taking Darvocet (narcotic), Zebertol, Vicodin (narcotic), Neurontin (for pain), Celexa (for depression), and Mobic (non-steroidal anti-inflammatory). She denied smoking or alcohol use. Plaintiff's liver function tests were normal, her gallbladder ultrasound was normal. Dr. Fulton stated that plaintiff's pain was probably secondary to gastritis or peptic ulcer disease. He prescribed Prevacid.

On October 19, 2001, plaintiff saw Mark Box, M.D. (Tr. at 219). Since her last visit, she had been seen in the emergency room with episodes of recurrent vomiting. "She is still having some problems with nausea." On exam, plaintiff had classic fibromyalgia tender points. Dr. Box told plaintiff to resume taking the Neurontin and Celexa, and he gave her a prescription for Compazine for nausea.

8

On November 9, 2001, plaintiff called Dr. Box's office and requested a Medrol Dose Pak (steroids) for muscle spasms in her lower back. Dr. Box called in the prescription for plaintiff.

On November 29, 2001, plaintiff saw Mark Box, M.D. (Tr. at 216). She continued to have trouble sleeping. She was on Neurontin, Nexium (for excess stomach acid), and Celexa. She was having more generalized problems with muscle spasms and aches and pains. She had classic fibromyalgia tender points. Dr. Box continued plaintiff on Neurontin and Celexa, and gave her samples of Skelaxin (muscle relaxer).

On December 14, 2001, Dr. Box wrote a letter to plaintiff's personal injury attorney (Tr. at 217-218). Dr. Box noted that plaintiff had been doing fairly well until she was in an automobile accident. Since the accident, he said that she had been on several leaves of absence from work due to increased back pain, she had not functioned well, and her fibromyalgia had been consistently worse since her car accident. He stated that plaintiff had had to take Darvocet, Percocet, and Lortab (all three are narcotics) on a much more frequent basis, and she had to increase the amounts of her other medications. She has experienced a great number of side effects from the medication, including GI upset and frequent episodes of nausea and vomiting secondary to pain medication.

9

December 19, 2001, is plaintiff's amended alleged onset date.

On January 8, 2002, plaintiff called Dr. Box complaining of nausea and vomiting for three days (Tr. at 216). He prescribed Compazine.

On January 16, 2002, plaintiff saw Mark Box, M.D. (Tr. at 215). "Since her last visit, she has had another episode of severe nausea and vomiting almost all of last week. She was having persistent nausea and vomiting." Plaintiff had been taking Neurontin (for pain), Nexium (for excess stomach acid) and Celexa (for depression). She continued to have a lot of problems with generalized body aches and pains, stiffness, and difficulty sleeping. On exam, Dr. Box found classic fibromyalgia tender points that were moderate to severe. Dr. Box told plaintiff to discontinue Celexa and begin taking Remeron (antidepressant). She was to continue with Nexium.

On January 23, 2002, plaintiff had an endoscopy due to vomiting (Tr. at 300-301). The results were normal.

On January 24, 2002, plaintiff saw Mark Box, M.D. (Tr. at 214). She was not certain if Remeron was helping in comparison to the Celexa. She was still having difficulty sleeping. She had undergone an upper endoscopy the day before which was negative. On physical exam, plaintiff had the classic fibromyalgia tender points. Although Dr. Box assessed plaintiff

10

with stable fibromyalgia, he noted that "she is still quite symptomatic at times." He told her to continue with the Remeron and Neurontin, and he would consider switching her back to Celexa if she did not get relief.

On February 4, 2002, plaintiff called Dr. Box and reported low back pain with walking or standing up (Tr. at 214). The pain radiated down her buttocks and into her legs. He prescribed a Medrol Dos Pak (steroids). The remainder of the record is illegible.

On February 6, 2002, plaintiff called Dr. Box's office complaining of back pain (Tr. at 213). She stated that she had gotten no relief from her medications. He scheduled her for an MRI the next day.

On February 7, 2002, plaintiff had an MRI of her lumbar spine which showed mild disc degeneration at L5-S1 (Tr. at 298).

On February 11, 2002, plaintiff saw Vincent Johnson, D.O., at St. Joseph Health Center (Tr. at 295-296). She complained of low back pain, exacerbated since early January. She was taking Percocet (narcotic) three times per day and had been taking up to eight Vicodin (narcotic) per day. Plaintiff was also taking Zebutal for migraine headaches, Nexium for gastritis, Remeron (antidepressant) and Ambien (for sleep). Plaintiff reported pain that was worse when she stood up or walked, better on sitting or lying down. Her pain was rated a 5/10, and had been a 9/10.

11

Plaintiff described her migraines as a headache that lasts for days and days, and those occur every six to eight weeks. Dr. Johnson observed that plaintiff was in moderate distress. She had to use to handrails to get up from the chair. Lumbar flexion was limited to 40 degrees. Plaintiff had a moderate amount of paravertebral muscle spasm in her lower back. Dr. Johnson reviewed an MRI from February 7, 2002, which revealed mild disc degeneration evident at L5-S1. He assessed mechanical low back pain and myofascial pain disorder. Plaintiff had trigger point injections to the tender areas. He told her to come back in two to three weeks, when he may consider epidural steroid injections.

On February 19, 2002, plaintiff saw Dr. Box for a refill of Percocet (narcotic) (Tr. at 213). He provided her with a prescription for 100 pills.

On February 20, 2002, plaintiff saw Vincent Johnson, D.O., at St. Joseph Health Center (Tr. at 291). Plaintiff was suffering from pain in her neck and both shoulders. On exam, plaintiff had multiple trigger points in her trapezius muscles bilaterally and in the thoracic paravertebral musculature. She was assessed with symptomatic myofascial pain. Dr. Johnson performed trigger point injections to the inflamed areas.

On February 26, 2002, plaintiff was seen at St. Joseph Health Center by Wayne Brown, M.D., for back pain (Tr. at 288-289). She had previously undergone injections in her upper back

12

which were helpful. Her pain was now in the low back area, and her pain was described as a 7/10 even with four to Percocet tablets (narcotic) per day and Celebrex (non-steroidal anti-inflammatory) 200 mg per day. "Pain is exacerbated by standing, walking and with activities of daily living." Plaintiff was doing daily stretching. She was not sleeping well due to her pain. Plaintiff had global tenderness in her lower back on palpation. Palpation at the right and left posterior superior iliac spine reproduced a significant component of the low back pain. Dr. Brown assessed fibromyalgia and myofascial pain in the low back area. Plaintiff received injections of anesthetic and steroid in her lower back.

On March 29, 2002, plaintiff saw Mark Box, M.D. (Tr. at 209). Plaintiff said she had been seeing a psychiatrist to help with her depression. She was on Effexor XR, and off Remeron because of weight gain. "She had some problems with finances and did not refill her Neurontin. She definitely feels as though her fibromyalgia symptoms are worse off of the Neurontin. She continues on Nexium. . . . She is still having a lot of problems with generalized body aches and pains and fatigue. . . . She has difficulty on a day-to-day basis even doing simple activities because of the pain and fatigue." Plaintiff's weight was 263.5. All 18 fibromyalgia tender points were present and moderate to severe in intensity. Dr. Box recommended plaintiff get back on

13

Neurontin. "Hopefully with some of the medications the
psychiatrist is trying she may also find improvement with her
fibromyalgia symptoms."

On April 10, 2002, Dr. Box wrote a letter to whom it may
concern (Tr. at 211-212). He reported that he had treated
plaintiff for fibromyalgia for the past eight years, and her
condition had been worsening markedly over the past year and a
half. Her condition had worsened also due to a car accident.
"Adjustments have been made in her medical regimen. A variety of
treatments including physical therapy and pain management
referrals have been tried. Despite these measures, her pain
level remains at an increased intensity that has prevented her
from maintaining regular employment. At this point, I do not
expect significant improvement in her symptoms and believe that
she has become completely disabled."

On April 23, 2002, plaintiff saw Peter Caruso, M.D.,
complaining of a migraine (Tr. at 390). Most of the record is
illegible.

On June 3, 2002, plaintiff saw Timothy Blackburn, M.D., a
cardiologist, at the request of Dr. Box (Tr. at 186-187).
Plaintiff had reported palpitations and shortness of breath over
the past eight or nine months which was getting worse. She
reported having gained about 25 pounds due to inactivity and
deconditioning, as her activity was limited by chronic pain

14

related to fibromyalgia. Plaintiff's heart palpitations were increasing in frequency and had been waking her from sleep. Plaintiff was noted as being a non-smoker with very minimal alcohol intake and minimal caffeine use. Dr. Blackburn gave plaintiff an event recorder monitor which, on August 12, 2002, showed 17 tracings obtained. Plaintiff had tachycardia with a heart rate as high as 165 beats per minute. Plaintiff was diagnosed with supraventricular tachycardia and was prescribed Toprol (Tr. at 184-185).

On October 15, 2002, Mark Box, M.D., a rheumatologist, wrote a letter to whom it may concern (Tr. at 199-201). Dr. Box stated that he had been treating plaintiff for fibromyalgia since October 1994. "The activities from her work were severely exacerbating her fibromyalgia to the point that she could barely function outside of the workplace and it had gotten to the point that she could not continue in her job. Tonya was having such problems with overwhelming pain involving her neck, shoulders, arms, back, and legs that she could not continue doing the manual work that she was doing at Lipton." Dr. Box stated that plaintiff required fairly frequent use of narcotic pain medications for pain relief, and despite that medication, her symptoms had not been well controlled. Dr. Box noted that plaintiff's condition was worsened recently due to her ankle fracture. "The patient had not been able to return to her work

15

situation because of the severity of her fibromyalgia. Even after her ankle has healed and she is back to normal ambulatory status, I do not believe that she is going to be able to return to a competitive work situation. I think the degree of chronic pain that she is currently suffering from would preclude her returning to a manual job, and I do not think that she could return even to a sedentary job that would require prolonged sitting or repetitive use of her arms or legs." Dr. Box's opinion was that plaintiff had been unable to work since December 19, 2001, that her fibromyalgia had deteriorated over time and had at that time reached a point of disability.

That same day, Dr. Box completed a Residual Functional Capacity Assessment (Tr. at 202-205). He found that plaintiff could occasionally lift ten pounds and frequently lift less than ten pounds; sit at one time for less than an hour; sit for a total of two hours per day; stand or walk for less than an hour per day; and that she needs to lie down more than four hours per day. He found that plaintiff could grasp and could perform fine manipulation, but that she could not use her arms or legs to repetitively push and pull or for bilateral manual dexterity. He found that plaintiff could never bend, squat, stoop, crouch, crawl, kneel, climb, or maintain balance, and that should be occasionally reach. At the time, plaintiff was in a cast due to her recent ankle fracture. Finally, Dr. Box stated that

16

plaintiff's impairment would likely cause her to be absent from work more than three times per month.

## C. *SUMMARY OF TESTIMONY*

During the August 18, 2004, hearing, plaintiff testified; and Janice Hastert, a vocational expert, testified at the request of the ALJ.

### 1. Plaintiff's testimony.

Plaintiff was 37 years of age at the time of the hearing, having been born in 1967 (Tr. at 33). She graduated from high school and completed two semesters of college (Tr. at 33). Plaintiff last worked in December 2001 (Tr. at 33). She was a forklift driver in a warehouse working 12 hours per day (Tr. at 33). She did a lot of heavy lifting and she climbed stairs a lot (Tr. at 33). She worked that job for 16 years and nine months (Tr. at 34). Before she was a forklift driver, she worked in the warehouse doing quality control, which involved very heavy lifting and a lot of walking (Tr. at 35-36).

In November 2001, plaintiff was in a car accident, and she had a concussion from her head hitting the back of the seat (Tr. at 37). She tried to come back to work for a year, but she was off for months and months at a time (Tr. at 37). She had had 17 shots of cortisone in her back in ten months, and she determined she could not return to her job (Tr. at 37). Her doctor recommended that she go on disability, so she went on long-term

17

disability which requires that she apply for Social Security disability as well (Tr. at 37).

Plaintiff was off work all of December 2001, and she was in much more pain than she had been previously (Tr. at 38). She takes more medicine since her accident, and takes stronger medicine (Tr. at 38). Plaintiff experiences drowsiness and forgetfulness because of her medication (Tr. at 38).

Plaintiff spends most of her time in bed unless she has a doctor's appointment (Tr. at 38). She is 5'9" tall and at the time of the hearing weighed 243 pounds (Tr. at 38-39). When she last worked, she weighed about 200 pounds, but she had gained a lot of weight because she was unable to exercise (Tr. at 39). Plaintiff used to be a body builder, she used to roller skate four times a week, she would walk 4.5 miles in 45 minutes daily for exercise, she lifted weights (Tr. at 39). She cannot do any of those things anymore (Tr. at 39).

Plaintiff lives alone in a house (Tr. at 39). Her sole source of income was disability, plus she was receiving a small check from her insurance on her job (Tr. at 39). Plaintiff's father does all her yard work, and her mother does her laundry (Tr. at 40). Plaintiff's mother does the house cleaning for her (Tr. at 40). Plaintiff's mother comes to her house five or more times per week (Tr. at 40). Plaintiff had driven about six times in the last 30 days (Tr. at 41). She drives to the doctor or to

the store if she only needs something small (Tr. at 41).
Otherwise, her parents bring groceries to her (Tr. at 41).
Plaintiff's parents are 67 and 64 (Tr. at 41).  Her mother drove
her to the hearing (Tr. at 41).

Plaintiff has migraines, she has tightness and pain in her
neck, shoulders, upper and lower back (Tr. at 38).  She has very
bad muscle spasms that can only be controlled with shots of
Cortisone (Tr. at 38).  She has bursitis in her hips that can
only be controlled with Cortisone shots (Tr. at 38).  She has
bone-deep pain in her right ankle which can only be controlled
with Cortisone shots (Tr. at 38).  Plaintiff's back pain is
significantly worse than when she was working (Tr. at 41-42).
Her shoulder and neck pain is also much worse (Tr. at 42).  When
plaintiff was working, she was taking four to five Oxycodones
twice a day (Tr. at 42).  At the time of the hearing, she was
taking eight of those twice a day (Tr. at 42).  Plaintiff takes
medicine for anxiety (Tr. at 42).  She has been in six car
accidents, she was hit six times, and she is very anxious about
being in cars (Tr. at 42).  She takes medication for underactive
thyroid, to help her sleep, for pain, and to elevate her mood
(Tr. at 43).  Plaintiff takes medication to help her go to sleep,
and more medication to help her stay asleep (Tr. at 43).  She
used to take 150 mg of Seroquel for sleep, but now she has to
take 300 mg (Tr. at 43).

19

Because of acid reflux disease and all of plaintiff's prescription medications, she gets sick to her stomach a lot (Tr. at 43). She spends most of her days lying in bed (Tr. at 43). She only gets up and leaves her bedroom to get something to drink to take her medicine with or to go to the bathroom (Tr. at 44).

Plaintiff fell down the stairs and crushed the inside bones of her ankle, which resulted in surgery in June 2002 (Tr. at 45). She had two more surgeries to remove a screw and to remove scar tissue, a bone spur, and a piece of bone that had been crushed in the fall (Tr. at 45). Her ankle is still not right (Tr. at 45). Plaintiff still has to use ice on her ankle and elevate it (Tr. at 45).

**2.    Vocational expert testimony.**

Vocational expert Janice Hastert testified at the request of the Administrative Law Judge. The first hypothetical involved a person who could lift up to 20 pounds, ten pounds frequently, could do occasional stooping, crouching, kneeling, crawling, and climbing (Tr. at 48). The vocational expert testified that such a person could be a quality inspector and a packer, both jobs plaintiff previously performed (Tr. at 48-49). The person could also work as a cashier, an unskilled light job, with 17,000 jobs in Missouri and 844,000 in the country (Tr. at 49). The person could be a microfilm melter, with 300 in Missouri, and 12,500 in the country (Tr. at 49). The person could be an office helper,

20

with 1,700 in Missouri and 116,800 in the country (Tr. at 49).
Those are all light jobs (Tr. at 49).  The person could also
perform the following sedentary jobs: electronics assembler, with
800 in Missouri and 28,000 in the country, phone solicitor, with
4,000 in Missouri, and 36,000 in the country, and optical goods
assembler, with 260 in Missouri, and 11,000 in the country (Tr.
at 49).  The sedentary jobs would not require postural movements,
such as stooping, crouching, kneeling, crawling, or climbing (Tr.
at 49).

The next hypothetical incorporated the residual functional
capacity assessment of Dr. Mark Box dated October 15, 2002 (Tr.
at 50).  The vocational expert testified that such a person could
do no work because of excessive absences due to chronic pain and
the inability to work 40 hours per week (Tr. at 51).

The next hypothetical involved a person would need to spend
two to three hours of each work day in bed due to pain (Tr. at
51).  The vocational expert testified that such a person could
not work (Tr. at 52).

The next hypothetical involved a person who would need to
take unscheduled breaks to take medicine (Tr. at 52).  The
vocational expert testified that in most settings, employees are
not allowed to take unscheduled breaks (Tr. at 52).

## V. FINDINGS OF THE ALJ

On December 22, 2004, Administrative Law Judge Jack McCarthy entered his opinion finding plaintiff not disabled until May 30, 2002 (Tr. at 22-29).

The ALJ noted that plaintiff had been found disabled by an initial determination with an onset date of January 2, 2002; however, plaintiff requested an administrative hearing because she believed she had become disabled 15 days earlier, on December 18, 2001 (Tr. at 22).  The ALJ observed that he was not bound by the initial determination, and that his role was to determine whether plaintiff was disabled at all (Tr. at 22).

At the first step of the sequential analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity since her alleged onset date (Tr. at 23).  He stated specifically as follows:

> The claimant's earnings record shows earnings of $20,153.45 in 2002.  While the claimant's attorney also reported in the July 28, 2003, letter discussed above that the claimant received holiday pay and had an unsuccessful work attempt in February 2002, these earnings have not been fully explained by the claimant, who has the burden at step one of establishing that she has not engaged in substantial gainful activity since the amended alleged onset date.  For purposes of this decision only, the undersigned finds insufficient evidence of substantial gainful activity since her amended alleged onset date.  Accordingly, the undersigned will continue with the sequential analysis.

(Tr. at 23).

The ALJ found that plaintiff suffers from status post right ankle fracture with three repair surgeries, back pain,

22

fibromyalgia, and myofascial pain syndrome, all of which are severe impairments (Tr. at 26). However, he found insufficient evidence to evaluate any mental impairment (Tr. at 26).

He found that plaintiff's impairments do not meet or equal a listed impairment (Tr. at 26).

After evaluating the record, the ALJ found that plaintiff was not credible prior to May 30, 2002 (Tr. at 27). He found that prior to May 30, 2002, she retained the residual functional capacity "to lift up to 20 pounds and 10 pounds frequently. She was limited to occasionally stooping and crouching." No other physical abilities were mentioned (Tr. at 27).

At the fourth step of the sequential analysis, the ALJ found that plaintiff could return to her past relevant work as a quality control inspector and packer (Tr. at 27). Therefore, plaintiff was found not disabled from December 19, 2001, until May 30, 2002, based on the fourth step of the sequential analysis.

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible, because he relied in part on the fact that plaintiff had recorded earnings in 2002.

### A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio

23

v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is not supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional

24

restrictions.   Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).   Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

The claimant is 37 years old with a high school education and two semesters of junior college.  The claimant testified that she lives alone in a house that she owns.  She stated that her father mows her yard and her mother helps with laundry and housecleaning.  The claimant alleged that she spends most of her time in bed, lying down due to pain.  She complained of migraines, neck pain, shoulder pain, back pain, bursitis of the left hip, and right ankle pain.  She receives cortisone shots in most of these areas to control her pain.  The claimant is taking the following prescription medications: Neurontin, Anaprox, Migren, Restoril, Seroquel, Flexeril, Lexapro, Klonopin, Xanax, Toradol, Nexium, Lovxyl and oxycodone.  The record indicates that her symptoms became incapacitating on May 30, 2003 [sic], when the claimant fractured her right ankle.  The claimant has undergone three surgeries on her ankle since the injury.  She alleged having no hobbies or outside activities.  In addition, the claimant stated she often stays in bed due to pain.  Based on these factors, the undersigned finds the claimant's impairments became disabling on May 30, 2002.  However, before this time, her impairments did not prevent her from performing all work.  Even Dr. Box stated in his October 15, 2002 letter that her current status was complicated by a recent ankle fracture.  The record indicates that the claimant had a history of fibromyalgia since 1987 with all 18 tender points since 1997 and a history of back pain since 1997.  Thus, she has been able to work with these conditions in the past.  Moreover, although the claimant indicated that she had an exacerbation of back pain in January 2002, the record shows her pain was alleviated with trigger point injections.  Also, a MRI of the claimant's lumbar spine revealed no disc bulge or herniation.  Furthermore, progress notes from Dr. Box indicate that she was not taking her Neurontin mediation before she fractured her ankle in May 2003, and Dr. Box encouraged her to get back on it.  Based on these factors, the undersigned finds that the claimant could have performed some light work before fracturing her ankle on May 30, 2002.

25

Based on the overall record, the undersigned concludes that the allegations by the claimant are not credible before May 30, 2002.

(Tr. At 26-27).

Although I disagree with plaintiff that the ALJ relied on plaintiff's posted 2002 earnings to determine that she was not credible before May 30, 2002, I agree with plaintiff that the ALJ erred in finding her testimony for that time period not credible.

## 1. *PRIOR WORK RECORD*

Clearly plaintiff's prior work record supports her credibility. Plaintiff worked her entire adult life, 16 years and nine months, for the same employer and earned significant income until she became disabled. Her steady work record showing significant earnings shows that she has always been motivated to work, and supports her allegation that she quit only because of her impairments.

## 2. *DAILY ACTIVITIES*

The ALJ acknowledged that plaintiff's parents do most of her house work, shopping, and yard work, and that plaintiff alleged she stays in bed most of the time due to her symptoms. However, the ALJ erroneously attributed these daily activities to plaintiff's ankle fracture, which occurred in early June 2002.

On September 21, 2001, Dr. Box noted that despite her medications, plaintiff still had a lot of pain that made it difficult for her to function. Plaintiff suffered nausea and

26

vomiting all during October 2001 due to her medications.  In
November 2001, she was having muscle spasms in her back, aches
and pains, and trouble sleeping.  In December 2001, Dr. Box noted
that plaintiff had not been functioning well.  In January 2002,
plaintiff had difficulty sleeping, body aches, muscle stiffness,
and multiple episodes of nausea and vomiting due to medication.
Plaintiff was noted as being "quite symptomatic".  In February
2002, she had low back pain with standing up or walking, and she
had migraine headaches.  She rated her pain five to nine out of
ten.  She underwent trigger point injections, and injections of
anesthesia and steroids.  Plaintiff was seen by her doctor at
least seven times in February alone.  In March 2002, plaintiff
was having difficulty on a day-to-day basis even doing simple
activities because of her pain and fatigue.  Plaintiff's
migraines continued into April 2002.

The medical records clearly reflect a medical cause for
plaintiff's limited daily activities prior to her ankle fracture
in June 2003.  This factor supports a finding that plaintiff's
allegations prior to May 30, 2002, were credible.

**3.  *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS***

The ALJ stated in his order that plaintiff's pain was
alleviated with trigger point injections, and he pointed out that
plaintiff was not taking Neurontin prior to her ankle fracture.
These statements are not supported by the record.

27

Plaintiff underwent multiple trigger point injections and injections of anesthesia and steroids. There is no evidence, however, that these injections alleviated her pain. Eight days after the first set of trigger point injections noted above, plaintiff received a prescription for 100 Percocet tablets, a narcotic analgesic. Plaintiff underwent multiple injections, noting only that they were helpful, never that they alleviated her pain. In fact, Dr. Brown noted that even after her injections, plaintiff's pain continued to be exacerbated by activities of daily living.

On one occasion in March 2002, plaintiff told her doctor that she had not been able to fill the Neurontin prescription because she did not have enough money. The record contains several other instances over time during which plaintiff was unable to afford at least some of her medication. Plaintiff was on a large number of prescription medications[1]. There is no evidence that she spent her money on cigarettes or alcohol or anything else frivolous instead of on her medications. Rather, she bought the medicine she could afford. In addition, being unable to afford her medication was not a regular occurrence, and there is only one notation during the relevant period when plaintiff was unable to fill her Neurontin prescription.

---

[1]The ALJ listed those medications in his order: Neurontin, Anaprox, Migren, Restoril, Seroquel, Flexeril, Lexapro, Klonopin, Xanax, Toradol, Nexium, Lovxyl and Oxycodone.

Case 4:06-cv-00322-REL   Document 14   Filed 02/21/07   Page 28 of 32

On January 16, 2002, plaintiff was taking Neurontin and
continued to have problems with pain, stiffness, and difficulty
sleeping.  On January 24, 2002, plaintiff was taking Neurontin
and was noted to be "quite symptomatic".

Therefore, the fact that on one occasion during the relevant
time period plaintiff was unable to afford her Neurontin in no
way supports a finding that her pain was not severe or disabling.

**4.    *PRECIPITATING AND AGGRAVATING FACTORS***

The ALJ does not specifically discuss precipitating and
aggravating factors, other than to imply that plaintiff's
fractured ankle caused her problems.  The ALJ failed to
acknowledge the many medical records indicating that plaintiff's
fibromyalgia and myofascial pain syndrome were causing her pain
when standing, walking, performing activities of daily living.
The records show that plaintiff consistently had fibromyalgia
trigger points that had become severe.

The ALJ relies heavily on Dr. Box's statement that
plaintiff's condition was worsened by her ankle fracture.
However, the ALJ ignored the remainder of that record, i.e., that
"Tonya was having such problems with overwhelming pain involving
her neck, shoulders, arms, back, and legs" which "required fairly
frequent use of narcotic pain medications for pain relief, and
despite that medication, her symptoms had not been well
controlled."  Dr. Box also wrote, "The patient had not been able

29

to return to her work situation because of the severity of her fibromyalgia. Even after her ankle has healed and she is back to normal ambulatory status, I do not believe that she is going to be able to return to a competitive work situation. I think the degree of chronic pain that she is currently suffering from would preclude her returning to a manual job, and I do not think that she could return even to a sedentary job that would require prolonged sitting or repetitive use of her arms or legs."

Based on these statements, the ALJ erred in plucking out Dr. Box's statement that plaintiff's ankle fracture worsened her condition without acknowledging Dr. Box's opinion that plaintiff was disabled due to fibromyalgia prior to breaking her ankle.

**5.    *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION***

The record establishes that plaintiff was on a large number of prescription medications, she took a large amount of narcotic medication which did not completely control her pain, her doctor repeatedly changed medications and doses. Plaintiff suffered from severe nausea and vomiting because of her medications, and those side effects resulted in visits to the emergency room, more prescription medication, and further tests such as an endoscopy. There is no evidence that plaintiff's symptoms were controlled by medication. There is ample evidence that her side effects were severe enough to interfere with any full time work schedule.

30

**6.  *FUNCTIONAL RESTRICTIONS***

As mentioned in more detail above, plaintiff alleged, and the records support her allegation, that she was unable to sit, stand, or walk for very long, and that she was required to lie down in bed most of the day due to headaches, body aches, muscle stiffness, muscle spasms, and nausea due to medication.

**B.  *CREDIBILITY CONCLUSION***

Based on all of the above, I find that the ALJ erred in finding plaintiff's allegations of disabling pain from December 19, 2001, through May 29, 2002, not credible.

**VII. CONCLUSIONS**

Because I find that the ALJ erred in finding plaintiff not credible, I find that the ALJ also erred in finding that plaintiff had the residual functional capacity to perform her pas relevant work as that finding is completely contradicted by plaintiff's credible allegations of disabling pain.  I also find that plaintiff's allegations of needing to lie down for hours each day is credible, and the vocational expert testified that a person with that limitation would be able to perform no work. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is granted.  It is further

ORDERED that the decision of the Commissioner is reversed and this case is remanded for an award of benefits.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 20, 2007